IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
COLUMBIA DIVISION


DEE ANN SMITH,             )
                                 )
v.                             )       No. 1:11-0085
                                 )
CAROLYN W. COLVIN,     )
      Acting Commissioner of    )
      Social Security[1]         )


To: The Honorable John T. Nixon, Senior District Judge


## REPORT AND RECOMMENDATION

The plaintiff filed this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying the plaintiff's claim for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB"), as provided by the Social Security Act.

Upon review of the Administrative Record as a whole, the Court finds that the Commissioner's determination that the plaintiff is not disabled under the Act is supported by substantial evidence in the record as required by 42 U.S.C. § 405(g), and that the plaintiff's motion for judgment on the administrative record (Docket Entry No. 15) should be DENIED.

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin is substituted for former Commissioner Michael J. Astrue as the defendant in this suit.

# I. INTRODUCTION

On February 15, 2007, the plaintiff filed applications for SSI and DIB, alleging a disability onset date of December 20, 2005, due to arthritis, depression, affective mood disorders, leg cramps, and muscle spasms.[2] (Tr. 56-62, 123, 125, 139.) Her applications were denied initially and upon reconsideration. (Tr. 56-66, 71-74.) The plaintiff appeared and testified at a hearing before Administrative Law Judge Donald Garrison ("ALJ") on April 13, 2010 (tr. 30-55), and on June 15, 2010, the ALJ entered an unfavorable decision. (Tr. 15-25.) On August 8, 2011, the Appeals Council denied the plaintiff's request for review of the hearing decision (tr. 7-10), thereby rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1-3.)

# II. BACKGROUND

The plaintiff was born on November 6, 1961, and she was forty-four years old as of her alleged disability onset date. (Tr. 134.) She has a tenth-grade education and has worked as a house cleaner, farmer, truck driver, groundsman, and power-line technician. (Tr. 33, 140, 146-48.) She has not been employed on a full-time basis since December of 2005.[3] (Tr. 34, 140.) She has been arrested multiple times for driving under the influence ("DUI") and was incarcerated for approximately 3-4 years until November 10, 2004. (Tr. 37-38, 237, 243, 270.)

---

[2] In the plaintiff's memorandum, she also alleges disability due to "bipolar disorder complicated by anxiety with frequent panic attacks." Docket Entry No. 16, at 2-3.

[3] The plaintiff testified that she worked briefly as a power-line technician after 2005 (tr. 34), but the ALJ did not consider this work to rise to the level of substantial gainful activity. (Tr. 17.)

**A. Chronological Background: Procedural Developments and Medical Records**

   **1. Physical Impairments**

On May 3, 2003, the plaintiff presented to the Sumner Regional Medical Center emergency room with "moderately severe joint pain" in multiple joints including her knees and back. (Tr. 201.) X-rays of her knees were normal except for "[m]ild degenerative changes," and she was diagnosed with inflammatory arthritis. (Tr. 201-02.)

On April 16, 2007, Dr. Albert Gomez, a Tennessee Disability Determination Services ("DDS") consultative physician, physically examined the plaintiff, who complained of depression and chronic pain in her neck, shoulders, elbows, wrists, lower back, hips, knees, and ankles. (Tr. 277-78.) She described the pain as "aching, . . . severe, [and] intermittent without radiation," and she reported that it "[i]ncreased with any movement of the joints" but "decreased with pain medications and rest." (Tr. 277.) Upon examination, Dr. Gomez found that the plaintiff had a normal gait and was able to get on and off the examination table "without difficulty." (Tr. 278.) She had moderate tenderness to palpation in her cervical spine with normal flexion and extension, and she had mild tenderness to palpation in her lumbar spine with full range of motion. (Tr. 278-79.) Her shoulders were tender to palpation, but she had full range of motion except for abduction and forward elevation at 140 degrees. (Tr. 279.) She also had full range of motion in her elbows, wrists, hips, knees, and ankles. *Id.* Straight leg raising tests were negative in both sitting and supine positions, and she was able to perform the tandem, heel, and toe walks normally and "squat and stand on one leg normally." *Id.* Dr. Gomez rated her motor strength at 5/5 in both upper and lower extremities. *Id.*

Dr. Gomez diagnosed the plaintiff with multiple joint pain, degenerative joint disease, alcohol abuse, and chronic depression, and he recommended that the plaintiff undergo a psychiatric evaluation. (Tr. 280.) He opined that she "could occasionally lift 20 to 30 pounds in an 8-hour workday" and "could stand or sit at least 6 hours in an 8-hour workday with normal breaks." (Tr. 279-80.)

On April 26, 2007, Dr. Joe Allison, a nonexamining DDS consultative physician, completed a physical Residual Functional Capacity ("RFC") assessment. (Tr. 281-88.) Dr. Allison opined that the plaintiff could lift and/or carry fifty pounds occasionally and twenty-five pounds frequently; stand and/or walk about six hours in an eight-hour workday; sit about six hours in an eight-hour workday; and push and/or pull without limitations. (Tr. 282.) Dr. Allison found no postural, manipulative, visual, communicative, or environmental limitations. (Tr. 283-85.)

On March 11, 2008, Dr. James Gregory, a DDS nonexamining consultative physician, also completed a physical RFC assessment with limitations identical to those found by Dr. Allison. (Tr. 373-80.) Dr. Gregory opined that the plaintiff's complaints were only partially credible and that Dr. Gomez's restrictions were not consistent with medical evidence "showing only mild [range of motion] decrease and [within normal limits] strength." (Tr. 379-80.)

### 2. Mental Impairments

The plaintiff received mental health treatment prior to her alleged disability onset date at Volunteer Behavioral Healthcare System ("Volunteer").[4] (Tr. 321-54.) Between November 25,

_____

[4] Volunteer includes Johnson, Hiwassee, Plateau, Guidance and Cumberland Mental Health Centers, and the ALJ referred to this service provider as "Cumberland." (Tr. 18.)

2003, and March 24, 2005, she was diagnosed with depressive disorder, not otherwise specified ("NOS"), alcohol dependence, and amphetamine abuse. (Tr. 326-27, 332, 335, 339, 341, 343, 348, 353.) On August 9, 2005, her diagnosis of depressive disorder, NOS, was changed to bipolar disorder, NOS. (Tr. 323-24.) She was assessed with a Global Assessment of Functioning ("GAF") score of 60 on November 25, 2003 (tr. 353), but her GAF score remained at 40 through November 15, 2005.[5] (Tr. 322, 324, 326, 328, 332, 335, 340-41, 343, 348.)

On December 19, 2005, Larry Welch, Ed.D., a nonexamining DDS consultant, completed a Psychiatric Review Technique ("PRT") (tr. 218-31) and mental RFC assessment. (Tr. 232-35.) Dr. Welch found that the plaintiff suffered from bipolar disorder, NOS, and substance disorder addiction "in reported remission." (Tr. 221, 226, 230.) In the PRT, Dr. Welch opined that the plaintiff had "no more than moderate overall limitations," including mild restriction of activities of daily living; moderate difficulties maintaining social functioning; moderate difficulties maintaining concentration, persistence, or pace; and one or two episodes of decompensation. (Tr. 228, 230.) In the RFC, Dr. Welch opined that the plaintiff had several moderate limitations in the areas of understanding and memory, sustained concentration and persistence, social interaction, and adaptation. (Tr. 232-33.) He explained that the plaintiff was "[a]ble to understand, remember and complete detailed tasks on a regular and continual basis with occasional difficulty sustaining [concentration, persistence, and pace]" and that she was able to interact with a small group or one-

_____

[5] The GAF scale is used to assess the social, occupational, and psychological functioning of adults. Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000) ("DSM-IV-TR"). A GAF score between 31 and 40 falls within the range of "some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." A GAF score between 51-60 falls within the range of "[m]oderate symptoms [or] moderate difficulty in social, occupational, or school functioning." *Id.*

on-one with people and could tolerate "occasional or superficial, not continual general public interaction." (Tr. 234.) He did not anticipate "major problems with supervisors or coworkers." *Id.* Finally, he opined that the plaintiff was "[a]ble to adapt to routine, not frequent or fast-paced change;" "avoid major hazards and take most transportation independently;" and "set and carry out most long-range goals with only occasional assistance." *Id.*

On February 7, 2006, the plaintiff returned to Volunteer with symptoms of depression, anxiety, and irritability, and she was "tearful" and reported having crying spells. (Tr. 313-14.) She was assigned a GAF score of 40 and prescribed Paxil, Equetro, and Seroquel.[6] *Id.* On October 26, 2006, she presented to Volunteer with depression, poor concentration, "sporadic" mood swings, and hallucinations, and she was given a GAF score of 50.[7] (Tr. 315, 320.) In addition to Seroquel, she was prescribed Lamictal and Neurontin,[8] and she was encouraged to attend meetings of Alcoholics Anonymous ("AA") and Narcotics Anonymous ("NA"). (Tr. 320.)

On January 4, 2007, the plaintiff went to the Sumner Regional Medical Center emergency room with "[a]cute alcohol intoxication" and "[d]epression with suicidal thoughts" after she called the police reporting that she had been drinking and "might kill herself." (Tr. 237.) She was

---

[6] Paxil is a selective serotonin reuptake inhibitor ("SSRI") used to treat depression, obsessive-compulsive disorder, panic disorder, social anxiety disorder, generalized anxiety disorder, and post-traumatic stress disorder. Equetro is an antipsychotic used to treat manic episodes of bipolar disorder and alcohol withdrawal. Seroquel is an antipsychotic used to treat both manic and depressive episodes of bipolar disorder as well as schizophrenia. Saunders Pharmaceutical Word Book 267, 536, 639 (2009) ("Saunders").

[7] A GAF score between 41 and 50 falls within the range of "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM-IV-TR at 34.

[8] Lamictal is an anti-convulsant used to treat seizures and bipolar disorder. Neurontin is an anti-convulsant used to treat partial-onset seizures and postherpetic neuralgia. Saunders at 396, 488.

subsequently hospitalized at the Middle Tennessee Mental Health Institute ("MTMHI") until January 8, 2007. (Tr. 243-257.) During an intake examination, the plaintiff had a depressed affect, and her thought content was described as "self-pitying," "hopeless," and "suicidal." (Tr. 249.) Her motor status was normal, and her memory was intact, but she had poor insight and judgment and experienced visual hallucinations. *Id.* During the plaintiff's inpatient treatment, it was noted that she was calm and cooperative, had a good appetite, and socialized with other patients. (Tr. 249, 253-54.) On January 5, 2007, she denied having suicidal or homicidal ideations, and on January 6, 2007, a psychiatric nurse noted that her "suicidal ideation [had] resolved" and that she did not have symptoms of alcohol withdrawal. (Tr. 254-55.) She was discharged on January 8, 2007, with diagnoses of alcohol induced mood disorder and alcohol dependence, and her GAF score was assessed in the 21-30 range.[9] (Tr. 243.)

The plaintiff returned to Volunteer on January 22, 2007, reporting that she had relapsed and complaining of problems with attention deficit disorder ("ADD"), low energy, and anxiety. (Tr. 310.) She was unwilling to attend AA or NA meetings, but Cindy Lemon, MSN APRN BC,[10] noted that she was compliant with medications. *Id.* She was diagnosed with mood disorder, NOS, alcohol dependence, and amphetamine abuse, and she was assigned a GAF score of 50. (Tr. 311.)

---

[9] A GAF score between 21 and 30 falls within the range of "behavior [that] is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends). DSM-IV-TR at 34.

[10] MSN stands for Master of Science in Nursing. BC stands for Board Certified, and APRN stands for Advanced Practice Registered Nurse.

Ms. Lemon increased her prescribed dosage of Seroquel, instructed her to discontinue Cymbalta,[11] and prescribed Strattera and Vistaril.[12]  (Tr. 312.)  On a Tennessee Clinically Related Group ("CRG") form, the plaintiff was categorized as a person "who [was] [f]ormerly [s]everely [i]mpaired" with moderate impairments in the areas of interpersonal functioning, adaptation to change, and concentration, task performance, and pace.  (Tr. 293-95.)

The plaintiff returned to Volunteer on March 5, 2007, requesting medication.  (Tr. 307.) Volunteer staff noted that she had a "hostile" attitude, "maintain[ed] peircing [sic] eye contact," and displayed an "angry" mood with "irritable, tearful affect" and psychomotor agitation.  (Tr. 308.) She was assigned a GAF score of 47 and diagnosed with "bipolar II disorder, current or most recent episode: hypomanic."  (Tr. 308.)

On April 3, 2007, Dr. Pilar Vargas, a DDS non-examining consultative psychiatrist, completed a PRT and mental RFC assessment.  (Tr. 258-74.)  In the PRT, Dr. Vargas opined that the plaintiff had moderate restrictions of activities of daily living; moderate difficulties maintaining social functioning; moderate difficulties maintaining concentration, persistence, or pace; and one or two epidodes of decompensation.  (Tr. 268.)  In the RFC, Dr. Vargas opined that the plaintiff was moderately limited in her ability to understand, remember, and carry out detailed instructions (tr. 272), but she explained that the plaintiff could understand, remember, and carry out simple instructions.  (Tr. 274.)  Dr. Vargas also found that the plaintiff was moderately limited in several categories related to sustained concentration and persistence (tr. 272), and specifically found that the

---

[11] The plaintiff had been prescribed Cymbalta during her hospitalization at MTMHI. (Tr. 245, 310.)

[12] Strattera is a non-stimulant treatment for attention-deficit/hyperactivity disorder ("ADHD"), and Vistaril is a minor tranquilizer.  Saunders at 663, 758.

plaintiff could concentrate on and carry out simple tasks, would "need a well[-]spaced environment with a few familiar coworkers," and would "benefit from a flexible schedule as [she] may miss 1-2 days a month of work due to symptomatology." (Tr. 274.) Dr. Vargas also opined that the plaintiff had moderate social limitations in the areas of interacting appropriately with the general public, accepting instructions and responding appropriately to criticism from supervisors, and getting along with coworkers and peers. (Tr. 273.) Dr. Vargas recommended that the plaintiff's "interaction with the public should be casual and nonintensive" and that she should receive "supportive" feedback and criticism. (Tr. 274.) Finally, Dr. Vargas opined that the plaintiff had moderate limitations responding appropriately to changes in the work setting and setting realistic goals or making plans independently of others (tr. 272), and she found that "changes in work setting should be gradually and infrequently presented" and that the plaintiff would need "some assistance in setting long term goals" but could "manage day to day ones." (Tr. 274.)

The plaintiff returned to Volunteer on April 16, 2007, reporting that she was "doing better" and was "happy all the time." (Tr. 305.) She relayed that she had not been agitated or angry but was "anxious when going to the grocery store" and was experiencing chronic pain. *Id.* She was given a GAF score of 55, and her prescribed dosage of Neurontin was increased to address her anxiety and chronic pain. (Tr. 306.) On June 12, 2007, she presented to Volunteer requesting information on mental health centers near her new home and reporting that, although she was concerned about changing to a new mental healthcare provider, she was "'doing well' considering 'everything [was] right with [her] medications.'" (Tr. 302.) A diagnosis of ADHD was added, her prescribed medications remained the same, and she was given a GAF score of 60. (Tr. 303.)

On November 14, 2007, the plaintiff presented to Volunteer with complaints of stress, depression, chronic pain, insomnia, and mood swings. (Tr. 299.) She reported that she was living in a campground, had lost thirty pounds since moving, and had been out of medication for two months. *Id.* She acknowledged that she "did well while [she] was on medication" but reported that Neurontin did "not work" and that she wanted to stop using it. *Id.* She was taken off of Neurontin and prescribed an increased dosage of Seroquel. (Tr. 300.) On a CRG form, she was assigned a GAF score of 60 and found to have moderate limitations in activities of daily living, interpersonal functioning, adaptation to change, and concentration, task performance, and pace. (Tr. 290-92.) She was categorized as a "[p]erson with [s]evere [i]llness" lasting less than six of the previous twelve months. (Tr. 292.)

On November 29, 2007, Dr. Brad Williams, a nonexamining DDS consultative physician, completed a mental RFC assessment. (Tr. 355-57.) Dr. Williams opined that the plaintiff had moderate limitations in several categories, including her ability to (1) understand, remember, and carry out detailed instructions; (2) maintain attention and concentration for extended periods; (3) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (4) interact appropriately with the general public; (5) accept instructions and respond appropriately to criticism from supervisors; (6) get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and (7) respond appropriately to changes in the work setting. (Tr. 355-56.) Dr. Williams further explained that the plaintiff "[c]ould understand and carry [out] simple tasks while getting along with others and adapting at that level of function with some difficulty" but "[w]ould not be able to perform more complicated tasks nor deal with public except

[in] simple situations." (Tr. 357.) On January 2, 2008, Dr. Williams completed a PRT (tr. 359-72), opining that the plaintiff had moderate limitations in the areas of activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace. (Tr. 369.)

The plaintiff was also treated for mental health issues at Community Mental Health Center ("Centerstone") from July 2008, through March 2010. (Tr. 381-447. ) During an intake assessment on July 30, 2008, she reported that she had few friends, avoided others, and experienced problems with staying on task and memory recall. (Tr. 396, 398.) David Highfield, a licensed alcohol and drug abuse counselor, assessed her with a GAF score of 50 and diagnosed "bipolar I disorder, most recent episode depressed, moderate" and alcohol dependence. (Tr. 390, 397.) On a CRG form completed the same day, she was assessed with moderate limitations in the areas of activities of daily living, interpersonal functioning, concentration, task performance, and pace, and adaptation to change. (Tr. 388-90.) She was classified as a "[p]erson[] with [s]evere and [p]ersistent [m]ental [i]llness," meaning that her severe impairments had lasted six months or longer in the previous year. (Tr. 390.)

On November 22, 2008, the plaintiff presented to Centerstone reporting that she "ran out of medication 3 or 4 months ago" and that she was feeling "[a]wful, very awful" and "need[ed] to get back on [her] medicine." (Tr. 401.) She relayed that she had gotten into a fight and was having racing thoughts, mood swings, paranoia, hypervigilance, and anxiety. *Id.* She was given a GAF score of 48 and prescribed Lamicital, Seroquel, and Lunesta.[13] (Tr. 405-06.) She did not return to Centerstone until April 24, 2009. (Tr. 414, 440-41.) On a CRG form completed on April 28, 2009, she was assessed with a GAF score of 50 and moderate limitations in all areas. (Tr. 385-87.) The

---

[13] Lunesta is used to treat chronic insomnia. Saunders at 418.

plaintiff next presented to Centerstone on October 16, 2009, reporting that she was drinking alcohol again, having done so at least six times in the last thirty days, but not to the point of intoxication. (Tr. 411-13, 437-38.)  She also expressed concerns about her depression and anxiety.  (Tr. 438.) Mr. Highfield noted that she "was offered help to arrest the drinking" but "refused."  *Id.*

The plaintiff did not attend her last two scheduled appointments at Centerstone in 2009 (tr. 435-36), but returned on January 8, 2010, complaining of mood swings and low energy and reporting that she was no longer taking her medication because she could not afford her insurance copay.  (Tr. 431-34.)  She reported that she had not drunk alcohol in the last month but had been unable to help with daily tasks at home, isolated herself from others, expressed anger toward herself, and experienced increased confusion and inability to follow simple instructions.  (Tr. 433.) Mr. Highfield noted that she had "no improvement" to "slight improvement" in meeting her therapeutic goals and objectives and that she "approache[d] therapy as . . . a means of getting disability and not to resolve issues." (Tr. 432-33.) On a CRG form, she was given a GAF score of 48 and it was noted  that she continued to experience moderate limitations.  (Tr. 382-84.)

During a home visit by Monica Crumby, a Centerstone clinician, on January 13, 2010, the plaintiff relayed that she had problems with transportation, arguments with her boyfriend, and also experienced difficulty with concentration.  (Tr. 429-30.) Ms. Crumby noted "slight improvement" in the plaintiff's medication compliance and she reported that the plaintiff otherwise appeared well-groomed and cooperative with a normal mood, appropriate affect, and logical thought content.  *Id.* At a counseling session on February 23, 2010, the plaintiff reported that she "ha[d] been working on her recovery," but Mr. Highfield noted "no improvement" towards her goals and objectives. (Tr. 427.)  On March 2, 2010, Ms. Crumby noted that the plaintiff exhibited a well-groomed

appearance, cooperative attitude, appropriate affect, normal mood, and logical thought content. (Tr. 424-26.)  Ms. Crumby also noted that the plaintiff had either achieved or made "significant improvement" toward several goals, including medication compliance.  (Tr. 424.)

On May 17, 2010, upon referral by the ALJ after the hearing, Dr. LaShonda Hughes, a DDS consultative psychologist, examined the plaintiff and completed a Medical Source Statement. (Tr. 448-455.)  The plaintiff reported having "fleeting" suicidal ideation, hallucinations, difficulty sleeping, and "significant mood changes."  (Tr. 450.)  She described her mood over the past month as "depressed, anxious and angry," and she relayed that she had poor concentration, low energy, crying spells, and panic attacks.  *Id.*  She reported that she no longer drank alcohol, except for a "rare" drink, and did not use drugs.  (Tr. 449.)

Dr. Hughes described the plaintiff as "cooperative and anxious" during the interview with a "sad" mood and congruent affect, and she found no evidence of malingering.  (Tr. 450.)  Upon mental status examination, Dr. Hughes noted that the plaintiff  "showed evidence of mild to moderate impairment in her short term memory," "moderate impairment in her ability to sustain concentration," and "moderate impairment in her long term and remote memory functioning."  *Id.* Dr. Hughes also found "evidence of a moderate impairment in her social relating" and evidence of a moderate impairment in "her ability to adapt to change."  (Tr. 451.)  Dr. Hughes noted that the plaintiff "appear[ed] to fall into the low average range of intellectual functioning" but had "adequate use of basic vocabulary and adequate basic math skills" as well as "a good capacity for abstract thinking and understanding."  (Tr. 450.)

Dr. Hughes diagnosed the plaintiff with "[m]ood [d]isorder NOS" and "[a]lcohol [d]ependence with physiological dependence, in sustained partial remission," and assessed her GAF

score at 45-50. (Tr. 451-52.) In her Medical Source Statement, Dr. Hughes opined that the plaintiff had mild limitations making judgments on simple work-related decisions, understanding and remembering complex instructions, and interacting appropriately with supervisors as well as moderate limitations carrying out complex instructions, making judgments on complex work-related decisions, interacting appropriately with the public or coworkers, and responding appropriately to usual work situations and changes in a routine work setting. (Tr. 453-54.)

### B. Hearing Testimony

At the hearing on April 13, 2010, the plaintiff was represented by counsel, and the plaintiff and Dr. Kenneth Anchor, a vocational expert ("VE"), testified. (Tr. 30-55.) The plaintiff related that she had a tenth-grade education, was forty-eight years old, and lived alone. (Tr. 33-34.) She testified that she was incarcerated for approximately three years and lost her driver's license after a DUI. (Tr. 34, 37.) She reported that she was released on November 10, 2004, and that she drinks 6-7 beers a month. (Tr. 35, 37.)

She testified that her emotions and "nerves" interfered with her ability to function and that she isolated herself from others 2-3 days per week and experienced anxiety attacks and mood swings. (Tr. 36, 46, 48-49.) She said that she was hospitalized for mental health issues in 2007, and that it was unusual for her to experience two days in a row without crying spells. (Tr. 37, 48.) The plaintiff reported that she had been compliant with taking her prescribed medications, Seroquel and Lamictal, but reported that Seroquel caused side effects such as leg tremors and drowsiness. (Tr. 36, 48-49.) She also testified that she suffered physical limitations due to arthritis, which caused swelling in her knuckles, elbows, hips, and back. (Tr. 37.)

The plaintiff testified that her daily activities included cooking simple meals, cleaning, washing laundry, doing dishes, and occasionally raking leaves in her yard. (Tr. 38.) She testified that she does not go grocery shopping alone because she gets "confused" and "panicked," adding that she cannot typically stay in a store for more than thirty minutes because of her anxiety. (Tr. 38-39, 45-46.) She testified that she did not have hobbies or socialize. (Tr. 39.) She reported that she had problems getting along with people, including her neighbor, and recounted an incident in which she "fought a lady in prison." (Tr. 41-42.)

The VE testified that his testimony was consistent with the Dictionary of Occupational Titles ("DOT") and classified the plaintiff's past work as a house cleaner as light and unskilled; as a farmer as heavy and skilled; as a groundsman as medium and semiskilled; and as a power line technician as medium and semiskilled. (Tr. 44-45.) The ALJ asked the VE whether a hypothetical person with the plaintiff's age, education, and work experience would be able to obtain work if they could "perform light work with occasional postural activities; . . . understand, remember, and carry out short and simple instructions, and make judgments on simple work-related decisions;" but could not interact with the public. (Tr. 50.) The VE responded that such a person could return to the plaintiff's past work as a house cleaner and could also perform light work as a poultry worker, packer, and production worker or sedentary work as a table worker, machine tender, or assembler. (Tr. 50-51.) The VE testified that these jobs would be available to a person who was also unable to adapt to changing work procedures or requirements and needed simple routine tasks. (Tr. 51.)

The VE testified that a person with a GAF score in the 51-60 range would be able to perform unskilled work but that a GAF score "much below 50 . . . would rule out all work." (Tr. 52.) On cross-examination, the VE conceded that a GAF score of 40, "[i]f that's all we knew . . . would

probably rule out all work," and that, if an individual was required to work alone, the number of available jobs would be reduced by "at least half." (Tr. 52-53.) The VE also testified that if a person missed more than two days of work each month, she would be unable to maintain full-time work. *Id.*

## III. THE ALJ'S FINDINGS

The ALJ issued an unfavorable ruling on June 15, 2010. (Tr. 15-25.) Based upon the record, the ALJ made the following findings:

1. The claimant met the insured status requirements of the Social Security Act through September 30, 2008.

2. The claimant has not engaged in substantial gainful activity since December 20, 2005, the alleged onset date (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.).

\*\*\*

3. The claimant has the following severe impairments: degenerative joint disease; a mood disorder, NOS (not otherwise specified); and a drug abuse/alcoholism (DA/A) condition (substance abuse disorder focused on alcohol abuse in the relevant past) (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

\*\*\*

5. The claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), with occasional ability to engage in postural activities (such as climbing, balancing, stooping, kneeling, crouching, and crawling), and with mental functional ability to understand, remember and carry out short and simple instructions and make simple work

related judgments, but with no public contact, production rate pace work or changes in work processes or requirements.

\*\*\*

6.      The claimant is capable of performing past relevant work as a house cleaner. This work does not require the performance of work related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

\*\*\*

7.      The claimant has not been under a disability, as defined in the Social Security Act, from December 20, 2005, through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

(Tr. 17-25.)

# IV. DISCUSSION

## A. Standard of Review

The determination of disability under the Act is an administrative decision, and the only questions before this Court are whether the decision of the Commissioner is supported by substantial evidence and whether the Commissioner employed the proper legal standards in reaching her conclusion. 42 U.S.C. § 405(g). *See Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971) (adopting and defining substantial evidence standard in context of Social Security cases); *Kyle v. Comm'r Soc. Sec.*, 609 F.3d 847, 854 (6th Cir. 2010). The Commissioner's decision must be affirmed if it is supported by substantial evidence, "even if there is substantial evidence in the record that would have supported an opposite conclusion." *Blakely v. Comm'r of Soc. Sec.,* 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir.

1997)); *Jones v. Comm'r of Soc. Sec.,* 336 F.3d 469, 477 (6th Cir. 2003); *Her v. Comm'r of Soc. Sec.,* 203 F.3d 388, 389-90 (6th Cir. 1999). Substantial evidence is defined as "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938)); *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007); *Le Master v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976) (quoting Sixth Circuit opinions adopting language substantially similar to that in *Richardson*).

A reviewing court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *See, e.g., Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984) (citing *Myers v. Richardson*, 471 F.2d 1265, 1268 (6th Cir. 1972)). The Court must accept the ALJ's explicit findings and determination unless the record as a whole is without substantial evidence to support the ALJ's determination. 42 U.S.C. § 405(g). *See, e.g., Houston v. Sec'y of Health & Human Servs.*, 736 F.2d 365, 366 (6th Cir. 1984).

The Commissioner must employ a five-step evaluation process in determining the issue of disability. *See, e.g., Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001) (citing *Abbot v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)). The original burden of establishing disability is on the plaintiff, and impairments must be demonstrated by medically acceptable clinical and laboratory diagnostic techniques. *See* 42 U.S.C. § 1382c(a)(3)(D); 20 C.F.R. §§ 404.1512(a), (c), 404.1513(d). First, the plaintiff must show that she is not engaged in "substantial gainful activity" at the time she seeks disability benefits. *Id.* (citing 20 C.F.R. §§ 404.1520(b), 416.920(b)); *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 539 (6th Cir. 2007). A plaintiff who is performing substantial gainful

activity is not disabled no matter how severe the plaintiff's medical condition may be. *See, e.g., Dinkel v. Sec'y of Health & Human Servs.*, 910 F.2d 315, 318 (6th Cir. 1990).

Second, the plaintiff must show that she suffers from a severe impairment that meets the twelve month durational requirement. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). *See also Edwards v. Comm'r of Soc. Sec.*, 113 Fed. Appx. 83, 85 (6th Cir. 2004). A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Barnhart v. Thomas*, 540 U.S. 20, 24, 124 S. Ct. 376, 157 L. Ed.2d 333 (2003) (citing 20 C.F.R. §§ 404.1520(c), 416.920(c)). Basic work activities are "the abilities and aptitudes necessary to do most jobs," such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; [c]apacities for seeing, hearing, and speaking; [u]nderstanding, carrying out, and remembering simple instructions; [u]se of judgment; [r]esponding appropriately to supervision, co-workers and usual work situations; and [d]ealing with changes in a routine work setting." 20 C.F.R. § 404.1521(b). The Commissioner is required to consider the combined effects of impairments that individually are not severe but cumulatively may constitute a severe impairment. 42 U.S.C. § 423(d)(2)(B); *Foster v. Bowen*, 853 F.2d 483, 490 (6th Cir. 1988).

Third, if the plaintiff is not engaging in substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and her impairment meets or equals a listed impairment, the plaintiff is presumed disabled without further inquiry, regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d), 416.920(d)). The plaintiff may establish that she meets or equals a listed impairment, and that the impairment has lasted or is expected to last for at least twelve months or result in death. *See Listenbee v. Sec'y of Health & Human Servs.*, 846 F.2d 345, 350 (6th Cir. 1988). The plaintiff is not

required to show the existence of a listed impairment in order to be found disabled, but such a showing results in an automatic finding of disability. *See Blankenship v. Bowen*, 874 F.2d 1116, 1122 (6th Cir. 1989).

Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, she is not disabled. *Id.* The plaintiff has the burden of proving inability to perform past relevant work or proving that a particular past job should not be considered relevant. *Cruse*, 502 F.3d at 539; *Jones*, 336 F.3d at 474 ("Through step four, the [plaintiff] bears the burden of proving the existence and severity of limitations caused by [her] impairments and the fact that [she] is precluded from performing [her] past relevant work"); *Smith v. Sec'y of Health & Human Servs.*, 893 F.2d 106, 109 (6th Cir. 1989). If the plaintiff fails to carry this burden, she must be denied disability benefits.

Once the plaintiff establishes a *prima facie* case that she is unable to perform her prior relevant employment, the burden shifts in step five to the Commissioner to show that the plaintiff can perform other substantial gainful employment and that such employment exists in significant numbers in the national economy. *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (quoting *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997)). *See also Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). To rebut a *prima facie* case, the Commissioner must come forward with proof of the existence of other jobs a plaintiff can perform. *Longworth*, 402 F.3d at 595. *See also Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 528 (6th Cir. 1981), *cert. denied*, 461 U.S. 957, 103 S. Ct. 2428, 77 L. Ed. 2d 1315 (1983) (upholding the validity of the medical-vocational guidelines grid as a means for the Commissioner of carrying his burden under appropriate circumstances). It remains the plaintiff's burden to prove the extent of her functional limitations. *Her*, 203 F.3d at 391. Even if the plaintiff's impairment does prevent her from doing

her past relevant work, if other work exists in significant numbers in the national economy that the plaintiff can perform, she is not disabled. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009). *See also Tyra v. Sec'y of Health & Human Servs.*, 896 F.2d 1024, 1028-29 (6th Cir. 1990); *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 88-89 (6th Cir. 1985); *Mowery v. Heckler*, 771 F.2d 966, 969-70 (6th Cir. 1985).

If the question of disability can be resolved at any point in the sequential evaluation process, the claim is not reviewed further. 20 C.F.R. § 404.1520(a)(4). *See also Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) (holding that resolution of a plaintiff's claim at step two of the evaluative process is appropriate in some circumstances).

## B. The Five-Step Inquiry

In this case, the ALJ resolved the plaintiff's claim at step four of the five-step process. At step one, the ALJ found that the plaintiff had not engaged in substantial gainful activity since her alleged disability onset date. (Tr. 17.) At step two, the ALJ determined that the plaintiff had the following severe impairments: "degenerative joint disease, a mood disorder NOS . . . , and a drug abuse/alcoholism . . . condition (substance abuse disorder focused on alcohol abuse in the relevant past)." *Id.* At step three, the ALJ found that the plaintiff's impairments, either singly or in combination, did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 18.) At step four, the ALJ determined that the plaintiff was capable of performing her past relevant work as a house cleaner. (Tr. 23-24.) The ALJ also made an alternative step-five finding that the plaintiff could perform the jobs of poultry worker, packer, production worker, table worker, machine tender, and assembler. (Tr. 25.)

**C. The Plaintiff's Assertions of Error**

The plaintiff argues that the ALJ erred by improperly evaluating her GAF scores. Docket Entry No. 16, at 4-11. The plaintiff also contends that the ALJ erred in concluding that she could return to her past relevant work despite her alleged mental impairments. *Id.* at 11-12.

**1. The ALJ properly evaluated the plaintiff's GAF scores.**

The plaintiff argues that the ALJ erred by rejecting the GAF scores assigned to her by Dr. Hughes and by the mental health professionals at Volunteer and Centerstone. Docket Entry No. 16, at 4-11.

Treatment records from Volunteer indicate that, between November 2003, and November 2007, the plaintiff was assigned a GAF score of 40 on ten occasions[14] (tr. 314, 322, 324, 326, 328, 332, 335, 341, 343, 348), a GAF score of 50 on two occasions (tr. 311, 320), a GAF score of 55 on one occasion (tr. 306), and a GAF score of 60 on three occasions (tr. 300, 303, 353). During her treatment with Centerstone between July 30, 2008, and March 2, 2010, she was assigned GAF scores of 48 and 50. (Tr. 384, 387, 390, 400, 405.) Dr. Hughes assigned a GAF score of 45-50 on May 17, 2010. (Tr. 452.)

A GAF score between 41-50 "reflects the assessor's opinion that the subject has serious symptoms *or* serious impairment of social or occupation functioning. *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 511 (6th Cir. 2006) (emphasis in original). *See also* DSM-IV-TR at 34.

---

[14] The majority of instances in which the plaintiff was given a GAF score of 40 preceded her alleged disability onset date. (Tr. 322, 324, 326, 328, 332, 335, 341, 343, 348.) Upon her discharge from MTMHI on January 8, 2007, she was assigned a GAF score of 21-30. (Tr. 243.)

In *Bratton v. Astrue*, 2010 WL 2901856, at *8 (M.D. Tenn. July 19, 2010) (Nixon, J.), this Court noted that:

> A GAF score can be helpful in assessing an individual's mental RFC. *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 503 n.7 (6th Cir. 2006). At the same time, the Sixth Circuit recognizes that a GAF score is a physician's subjective evaluation and not raw medical data. *Kennedy v. Astrue*, 247 Fed. Appx. 761, 766 (6th Cir. 2007). The Commissioner explicitly denies endorsing use of the GAF scale in Social Security disability programs, and states that "[i]t does not have a direct correlation to the severity requirements in our mental disorders listings." 65 Fed. Reg. 50,745, 50,764-765 (Aug. 21, 2000); *see also Kennedy*, 247 Fed. Appx. at 766; *DeBoard v. Comm'r Soc. Sec.*, 211 Fed. Appx. 411 (6th Cir. 2006).

*Bratton*, 2010 WL 2901856, at *8. As the Sixth Circuit has pointed out, there is no "statutory, regulatory, or other authority requiring the ALJ to put stock in a GAF score in the first place," *Kornecky*, 167 Fed. Appx. at 511, and "[a] GAF score is thus not dispositive of anything in and of itself, but rather only significant to the extent that it elucidates an individual's underlying mental issues." *Oliver v. Comm'r of Soc. Sec.*, 415 Fed. Appx. 681, 684 (6th Cir. Mar. 17, 2011). However, although a GAF score is not dispositive in determining an individual's mental RFC, it can be one of several factors weighed or considered in assessing an individual's mental RFC, *see Kornecky*, 167 Fed. Appx. at 503 n.7, and it can be useful in evaluating the consistency of a physician's treatment notes and opinions. *Bratton*, 2010 WL 2901856, at *8.

After reviewing the plaintiff's medical record, including GAF scores, narrative reports and CRG forms completed by staff at Volunteer and Centersone, as well as the medical opinions of DDS consultants Drs. Hughes, Vargas, and Williams, the ALJ explained his decision to discount the plaintiff's GAF scores thusly:

> The GAFs assigned throughout the evidence, in the treatment record CRGs from [Volunteer] and Centerstone as well as in Dr. Hughes['] CE report, include several ratings at 50 or below that would be consistent with preclusion of all work, if

supported. However, all of the documents indicating GAF at 50 or below are associated with narrative ratings of symptoms and mental functional limitations in the none-mild-moderate range. These obvious inconsistencies must be resolved within the context of the weight of the evidence. The weight of the evidence establishes no more than moderate symptoms and limitations. This is particularly the case when the claimant's persistent noncompliance with medications and treatment appointments and recurrent alcoholism are considered. Assignment of GAF ratings, by the nature of the exercise, is an arbitrary and extremely subjective activity. When the GAF scores repeatedly conflict with the more detailed narrative descriptions of specific symptoms and limitations, as is the case here, the GAF scores are not medically supported and they are thus not entitled to significant weight.

(Tr. 20.)

The ALJ appropriately considered the plaintiff's GAF scores and adequately explained his rationale for discounting them. As the ALJ noted, while the plaintiff was regularly assigned GAF scores in the range indicating serious symptoms, these GAF scores were often accompanied by narrative assessments or treatment notes indicating, at most, moderate symptoms. For example, the CRG assessments completed by Volunteer and Centerstone staff found the plaintiff to be moderately limited in her activities of daily living; interpersonal functioning; concentration, task performance, and pace; and ability to adapt to change. (Tr. 293-95, 382-90.) However, despite these moderate limitations, the CRG assessments contain GAF scores that would place the plaintiff's limitations in the serious range. Similarly, Dr. Hughes assigned the plaintiff a GAF score between 45-50 while simultaneously opining that the plaintiff had no more than moderate limitations. (Tr. 451-52.) The ALJ, tasked with resolving these discrepancies, determined that the record as a whole, and specifically "the more detailed narrative descriptions of specific symptoms" indicated no more than moderate limitations. The Court concludes that the ALJ properly evaluated the plaintiff's GAF scores and did not err in determining that they were not entitled to significant weight.

## 2. The ALJ properly assessed the plaintiff's mental impairments.

The plaintiff argues that the ALJ erred in determining that she was able to return to work as a house cleaner despite her mental impairments. Docket Entry No. 16, at 11-12. The gist of the plaintiff's argument appears to be that the ALJ improperly found her to have only moderate limitations, when, in the plaintiff's estimation, the record revealed more significant limitations.

In support of her contention, the plaintiff makes several arguments. First, she argues that the ALJ improperly "dismiss[ed]" her GAF scores showing serious impairments. Docket Entry No. 16, at 12. As discussed above, the ALJ did not simply "dismiss" her GAF scores, but rather appropriately determined that the GAF scores were inconsistent with the rest of the record showing moderate limitations.

Second, the plaintiff argues that "both the consultative psychologist and the treating mental health professionals were of the opinion that [her] overall level of functioning due to her mental illness was seriously impaired." *Id.* at 11. However, that is simply not the case. As the ALJ noted, each of the medical opinions in the record, including the CRG assessments, contained no more than moderate limitations for the plaintiff. (Tr. 19-21, 228, 232-34, 268, 272-74, 293-95, 355-57, 369, 382-90, 448-55.)

The plaintiff also argues that the ALJ ignored the testimony of the VE, who indicated that GAF scores "much below 50 . . . would rule out all work." Docket Entry No. 16, at 12; (tr 52). However, importantly, the ALJ specifically discounted the plaintiff's GAF scores as being unrepresentative of her true abilities. The ALJ was only required to incorporate into the hypothetical questions those limitations that he accepted as credible. *See Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 118-19 (6th Cir. 1994). Because the ALJ did not accept that the plaintiff had

limitations as serious as those indicated by her GAF scores, he was not required to accept the VE's testimony that such GAF scores would preclude all work.

In formulating the plaintiff's mental RFC, the ALJ determined that the plaintiff had the mental ability "to understand, remember, and carry out short and simple directions and make simple work related judgments" but that she should have "no public contact, production rate pace work or changes in work processes or requirements." (Tr. 21.) These capabilities and limitations are supported by substantial evidence in the record.

To the extent that the plaintiff argues that the ALJ improperly assessed her mental limitations, the Court has also considered the ALJ's compliance with 20 C.F.R. § 404.1520a. When assessing the severity of a plaintiff's mental impairment, the ALJ's written decision must include findings based upon a "special technique." 20 C.F.R. § 404.1520a(a). The special technique is a series of steps delineated in subsections (b) through (e) of 20 C.F.R. § 404.1520a. First, the ALJ is required to evaluate the plaintiff's "pertinent symptoms, signs, and laboratory findings to determine whether [the plaintiff has] a medically determinable mental impairment(s)."[15] 20 C.F.R. § 404.1520a(b)(1). Next, the ALJ must assess the plaintiff's degree of functional limitation caused by the mental impairment. 20 C.F.R. § 404.1520a(b)(2). The Regulations acknowledge the individualized nature of this step by requiring the ALJ "to consider multiple issues and all relevant evidence to obtain a longitudinal picture of [the plaintiff's] overall degree of functional limitation." 20 C.F.R. § 404.1520a(c)(1). Thus, the ALJ must "consider all relevant and available clinical signs and laboratory findings, the effects of [the plaintiff's] symptoms, and how [the plaintiff's]

_____

[15] If the ALJ determines that the plaintiff has a medically determinable mental impairment, the ALJ must provide detailed support for such findings in accordance with 20 C.F.R. § 404.1520a(e).

functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication, and other treatment." *Id.*

After considering all the available relevant evidence, the ALJ must rate the plaintiff's functional limitation in the four following functional areas: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation.[16] 20 C.F.R. § 404.1520a(c)(3). These four functional limitations are known as the "B" criteria. The term "B criteria" corresponds to the paragraph "B" criteria of the expansive list of mental disorders in 20 C.F.R. Pt. 404, Subpt. P, App. 1. The Regulations require the ALJ to attach a point value to each of the four functional areas. 20 C.F.R. § 404.1520a(c)(4). For the first three categories, the Regulations set forth a five-point assessment scale: none, mild, moderate, marked, and extreme. *Id.* The fourth category, episodes of decompensation, is rated with a four point scale: none, one or two, three, and four or more. *Id.* "If the ALJ rates the first three functional areas as 'none' or 'mild' and the fourth area as 'none,' the impairment is generally not considered severe and the [plaintiff] is conclusively not disabled." *Rabbers v. Comm'r of Soc. Sec.,* 582 F.3d 647, 653 (6th Cir. 2009) (quoting 20 C.F.R. § 404.1520a(d)(1)). If the impairment is severe, then the ALJ "will then determine if it meets or is equivalent in severity to a listed mental impairment," and, if it does not, then the ALJ will move on to assess the plaintiff's RFC. 20 C.F.R.§§ 404.1520a(d)(2)-(3).

The ALJ is also required to follow 20 C.F.R. § 404.1520a(e) in documenting the application of the special technique. The ALJ's written decision must include the germane findings and conclusions based on the special technique; show the plaintiff's significant history, such as medical

---

[16] Decompensation is the "failure of defense mechanisms resulting in progressive personality disintegration." Dorland's at 478.

examinations and laboratory findings, and the functional limitations considered in determining the severity of the plaintiff's mental impairments; and provide a specific finding regarding the level of the plaintiff's limitation in each of the four functional areas listed in 20 C.F.R. § 404.1520a(c)(3).[17] 20 C.F.R. § 404.1520a(e)(2).

The ALJ found that the plaintiff had the medically determinable mental impairments of mood disorder, NOS, and drug abuse/alcoholism and that these impairments were severe but did not meet or equal a listed impairment. (Tr. 17-21.) The ALJ evaluated the B criteria by assessing the plaintiff's restrictions on activities of daily living; difficulties maintaining social functioning; difficulties maintaining concentration, persistence, or pace; and episodes of decompensation. (Tr. 18-21.) The ALJ found that the plaintiff's reported daily activities evidenced only moderate limitations because the record reflected that she performed a "relatively wide range of daily activities that include[d] doing her own housekeeping (sweeping, laundry, washing dishes and doing other cleaning), preparing simple meals, grocery shopping, . . . doing yard work such as raking leaves . . .[and] sewing and crocheting." (Tr. 20.) Regarding social functioning, the ALJ found that she had moderate limitations, because, although she reported "social isolation and a tendency toward over aggression with others," she did her own shopping and had "meaningful relationships with others, including a boyfriend of some duration who helps her pay her bills." *Id.* The ALJ also assessed the plaintiff with moderate limitations in concentration, persistence, or pace, finding that she was able to carry out "a wide range of daily activities" and hobbies, some of which "require

---

[17] Since 2000, the ALJ is no longer required to complete a Psychiatric Review Technique Form ("PRTF"). *Rabbers*, 582 F.3d at 653-54. The Regulations only require that an ALJ's written decision "incorporate the pertinent findings and conclusions based on the [special] technique." *Id.* (quoting 20 C.F.R. § 404.1520a(e)(2)).

sustained concentration." (Tr. 21.) Finally, after considering the plaintiff's psychiatric hospitalization for five days in January 2007, the ALJ found that the plaintiff experienced no episodes of decompensation, determining that that instance was not of extended duration and "that she promptly regained mental stability." *Id.*

The ALJ complied with the Regulations by using the special technique to conclude that the plaintiff experienced only moderate limitations in activities of daily living; social functioning; concentration, persistence, or pace; and no episodes of decompensation of extended duration. (Tr. 20-21.) After applying the "B" criteria and giving specific ratings for each of the four functional limitation categories, the ALJ made specific findings supported by the record showing that the plaintiff only exhibited moderate limitations. (Tr. 20-21.)

## IV. RECOMMENDATION

For the above stated reasons it is recommended that the plaintiff's motion for judgment on the record (Docket Entry No. 15) be DENIED and that the Commissioner's decision be affirmed.

Any objections to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of service of this Report and Recommendation, and must state with particularity the specific portions of this Report and Recommendation to which the objection is made. Failure to file written objections within the specified time can be deemed a waiver of the right to appeal the District Court's Order regarding the Report and Recommendation. See *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully Submitted,

JULIET GRIFFIN
United States Magistrate Judge